The next case for argument is 17-2106, Align Technology v. ClearCorrect. Good morning, Your Honors. May it please the Court, William J. on behalf of the appellant Align Technology v. ClearCorrect, Align's very successful invention is directed to... Mr. J., can I interrupt you and talk? I need to have some preliminaries about case or controversy. So my understanding is that Align has not sued ClearCorrect on this patent. Is that right? That is right. That leaves me wondering why there is a case or controversy, even for you, coming to this court with no adversary except ClearCorrect, not the director as an intervener, to challenge the unpatentability ruling of the board. And part of what I'm thinking about is what the Supreme Court did a couple of months ago in the PNC against secure access case, in which the court concluded that because the PNC petitioners did not have a case or controversy with secure access as to the then at issue claim 24, which had never been asserted against them, that any dispute that did exist was moot and ordered, not only vacated our decision, but ordered that the board's decision would be vacated. I guess I'm trying to understand why without, unless you tell me something more about a prospective dispute, even a backward-looking one on this expired patent between Align and ClearCorrect, why there's a case or controversy, and if not, why we shouldn't vacate the board decision on that. So we think that there's a lot of controversy, primarily for the reason that we are the patent owner, the patent has been canceled, and the time for us to assert past infringement during the lifetime of the patent has not yet run. That was true, as I understand it, in secure access as well. In fact, I don't even think that was an expired patent. Okay, but in that case, the petitioner that lacked a continuing stake in the case was the CVM challenger, the entity challenging the patent. Like ClearCorrect here. That's correct, but here we are the appellant. I'm sorry, secure access was the appellant in this court in that case as well. That's true. Secure access was the appellant, but by the time the case got to the Supreme Court, of course, PNC was the petitioner, and it was PNC that the court concluded lacked a continuing stake in the case. Because there was no dispute between secure access and PNC, no concrete dispute, which, in fact, was always the case, apparently, as to Claim 24, but certainly was after all the other claims were invalidated and the infringement suit was dropped with prejudice. Here, again, we start with a record in which, as I understand it, you have never sued them on this patent. The patent is expired, and unless you have some, I don't know what the right language is, you know, reasonable likelihood of suing them for their past activities, I'm not sure why there's a case or controversy here if there wasn't in secure access. So let me do one. I'm going to drop the subject. No, no. Obviously, it's an important and threshold question, and I want to give the court as complete an answer as I can. We have asserted other patents in this family against ClearCorrect. That litigation is currently pending in the Southern District of Texas. A trial date has been scheduled. If the court were to vacate the decision of the board as moot, which would have the effect of having our patent claims not canceled in accordance with the board's decision,  however, it would produce a strange result if the next day we were to assert the patent against ClearCorrect, and ClearCorrect, I suspect, would say, wait a minute, what happened to the board decision? I guess I'll say one of the oddities, obviously, of coming to this court on appeal in comparison to filing in district court is that we don't have what you would have in district court, which is a factual allegation and a complaint asserting the basis for a case or controversy. That's true, but what you do have, and I think the closest analogy is to the Supreme Court's decision in Asarco v. Kadish, which is- I'm not sure why that was different in secure access, though. Perhaps, perhaps not, but we, of course, don't know for sure what happened or what motivated the court in secure access, because it's a summary Munsingware order without a reasoned explanation given by the court. But I think that Asarco is the analogy that I would make here, because our dispute, whether the director has intervened or not, our dispute is with the director, in addition to whatever dispute we have with ClearCorrect. Is there a reason why Align hasn't filed a lawsuit on this patent against ClearCorrect, along with all the other related patents that it's already filed lawsuits against? Not one that I can share with the court, I don't think. What I can say is that the wording of different patents and different claims in the family are different in some ways, and so the issues presented in the district court litigation at the moment are different. I appreciate that, Your Honor. So the board, we think, committed three clear errors, and they really all come from the basic nature of the invention in this case, which is providing digital data that could manufacture all of the appliances, beginning, middle, and end, at the outset of treatment. And so the board concluded that that providing limitation is in the prior art. It got it out of the snow reference, but that was incorrect, because it was equating the movement of actual teeth in the patent here with the generic all roads lead to Rome animation in snow. Second, it concluded, or it acknowledged, as it had to, that a device based on generic teeth would not fit the way that Invisalign aligners do. But then it attributed the motivation to make this combination, this obviousness combination, with the desire to make a more precise aligner. That reasoning is incoherent. And finally... Can we talk about that? I mean, changing the motion to combine is a difficult issue. So can we go back to the board's discussion of the reasons to combine, which does extend over four or five pages, or six or seven. And tell me if you can identify with some specificity if there's any sort of real problems you can point to in terms of their analysis. So I think the nub of the analysis is at 38 to 39 of the appendix, the summary paragraph at the end of that. And it concludes that there'd be a reason to make this combination to replace Kessling's labor-intensive process with a computerized process, resulting in labor cost savings and resulting in modeling of more precise teeth movement. But that's exactly what Snow doesn't provide, and what the reasoning that the board has just used in concluding that Snow discloses the relevant limitation of these claims. The board had said, oh, it doesn't matter, because a generic device will do. I'd like to explain why that was incorrect as well, but that really is the nub of our disagreement. There's no evidence in the record whatsoever to assert that there is a motivation to make generic aligners, which, as Dr. Martz testified, are one-shot devices.  To clarify something, you said no motivation to make generic aligners, and I understood the board's theory here to be to make a retainer or a positioner, and not necessarily an aligner like Invisalign's aligner that goes over the teeth, and so therefore with an aligner, with an appliance like that, you need very precise information about all the individual teeth, whereas with a retainer, you don't necessarily, I don't think, need to know all the information about a patient's teeth shapes. I'd like you to talk about that. That's a very important point, and you're correct that that's what the board said, and it is incorrect. It is not based on any substantial evidence. What I'd like to point the court to is the one piece of evidence on which the board relied for that very important conclusion, which is the 139 patent. The 139 patent is cited at page 15 without any pin site. It's sort of a general citation. But the 139 patent, which is building retainers, yes, but it's building them out of hardened material, and several of the teeth, the anchoring teeth, the portion of the retainer that's called the splint, those fit closely around the anchoring teeth, the teeth in the back of the mouth. And the patent says five or six times that this is a closely fitted device. So it's just simply not correct to say that retainers don't involve a close fit. Well, there's something else in the 139 patent that I think the board may have focused on that talked about something less than this closely fitting notion that you're referring to. There's one stray sentence which the other side quotes in its brief to this court, but if you read the very next sentence in the 139 patent that comes after that sentence, you will see that it is once again talking about the need for the splint portion of the retainer to be closely fitted around the teeth because those teeth, the teeth that are already in the right position, those are the anchors. They provide the anchoring against which the force is asserted against the teeth that are going to move. So you have to have a close and tight fit. Well, did you make this particularized argument about what the 139 patent said in your patent owner response below to the patent board? My understanding is the patent board seemed to think that your arguments were predicated on making an aligner, making an Invisalign type aligner and not these other things like a retainer, for example. And so now you're telling me, well, no, actually the retainer has all these other issues too and look at all this interesting information in the 139 patent. I want to be clear. There is evidence in the record from Dr. Martz about something that he described as rubbier or rubberier that is not a retainer. It's something generic and off the shelf. He says he's never used them and they're not ideal. And so they exist, but our point with respect to that device is that there is no motivation to make it or anything like it and it can't be used in seriatim, which is the nature of this invention, a plurality of data sets, a plurality of appliances provided at the outset of treatment. You can't do that with a generic device. Now, retainers, our patent does say that a retainer can be one of the appliances used with it. And this is the point that I want to clarify, that when our patent says that, it does not mean some kind of rubbery device bought off the shelf. It means a custom-fitted retainer as in the 139 patent, which is cited as a background art in our patent. So that's really the mistake that the board made, that it thought that these claims could be practiced with this quite generic device. But Snow does talk about designing data sets that are based on the orientation of a patient's teeth. It talks about scaling the default model up in terms of the sizing of the individual teeth. I think it also even talks about scaling of the jaw size as well. And so really the only thing that's missing in terms of, as I can understand it, in terms of what you're thinking you need is the particular shapes of all the individual patient teeth. And so I'm trying to figure out why is it, what is it from, say, your expert, that makes it clear that if you don't know the shape of the teeth, you couldn't possibly build a retainer out of that. Sure. So we have a couple of important points there. That's what you start with in Snow. You're still missing shape, but you have, as your question indicated, you have orientation and you have an approximation of size. But that's only the initial arrangement. As you animate Snow and you go to roam, every single Snow animation ends up in the same place. The teeth begin to morph into the final animation, which is the same for every single patient. So what you don't have is intermediate steps that actually look like the treatment steps, and you don't have a final tooth arrangement that looks like the treatment destination for any actual patient. Can I ask you this? One of the things that I guess I still am not clear about is, it's one thing to say that close fitting in the sense of reflecting individual tooth shape is required, and it's another thing to say that there has to be a representation of an actual patient's set of teeth, which doesn't by itself require the shape. It might well be limited to orientation, position and orientation for an individual patient. And I've been struggling to understand how much of your argument is dependent on a conclusion that the representation has to look like shape, has to reflect actual shape, the curves at the top of the teeth and so on. That is part of our argument. I would not say that our argument depends on it. Let me break it apart in these ways. Snow does not disclose the treatment steps, the intermediate or final positions for an individual patient, even if you assume that we are wrong about everything in your question just now. Let me continue on that for a second. In footnote 10, page 829 of the appendix, the board says, almost as an afterthought, but there it is, that there is evidence, and here I'm going to focus on my paragraph 93, which it doesn't cite directly but is cited in petition page 17 at 135, citing over to 1828. That paragraph of Ma seems to assert that you can read Snow as, and I'm going to put it this way, stopping short of the standard model in the sequence. And if you read it as stopping short, then all steps short of the last step are individualized, at least in a sense in which the final whole sequence is not individualized. So Ma does say that. The board did not credit it, of course, as your question recognized. I'm not sure it didn't. By citing petition page 17, which is A135, which relies on both Ma 93 and Martz 42, why didn't the board credit that? Because I think that the best reading is because the board comes back to Martz 42, but never mentions this aspect of Ma. I think it seems clear to us that it was getting this out of paragraph 42 of Martz, which, as we've said in our brief, simply does not support this. Dr. Martz did not say in his declaration. Put aside Martz, though. Ma seems to me to come at a minimum closer to supporting it. Sure. And if you assume that the board had credited Ma, it still would not be substantial evidence because we think it is a plain misreading of Snow. But the second position there is the final position, and you can't read it any other way. Right. The idealized second position in Snow is the same for every male patient, and it is the same for every female patient. Those are the only variants. There's one standard mouth for male patients. There's one standard for female patients. And what I took the board to be saying in footnote 10 is that if you just took one of the random stops along the way, so that on... They're not random. Well, they are arbitrary. They do not in any way correspond to real-world considerations like tooth collisions. Interpolations from the individual model to get back to the generic mouth. Yes, that's right. So you plot a course as the crow flies to this generic model, and then you divide it up into a certain number of segments that are exactly the same distance apart. They're just mile markers. They don't reflect any actual real-world tooth collisions, the rotation of some teeth faster than others, the length of the root, which Dr. Martz acknowledged was a consideration in how fast you can do tooth movement, the amount of jawbone. There are all kinds of considerations that in a real-world treatment case, they can be factored into a lines model, but cannot be in SNO. But SNO says not only is this useful for smaller filing cabinets, right, for record keeping, but also for, was it treatment planning or something? So he has two references to treatment planning, and I think that they are both fairly read as talking about the initial, essentially the patient record before it is animated. And here's what I mean by that. Number one, he talks about braces. Now, this is not an obviousness combination about braces, but if you were talking about braces, we think that what SNO is talking about, and I believe this is in column five at the bottom, he's talking about using the individualized 3D record, which is the patient's alignment, but the generic teeth. But I thought the crucial stuff in SNO was column four, starting around line seven or so. So you mean the thing about the jaw sensors, which start at 29? No, no, no, no. Column four, about new use, utilize of treatment planning to produce an improved form of treatment planning with the interpolated steps. Right, but this is not what the board relied on, right? What the board got out of SNO is actually further down, having to do with the position sensors attached to the jaws, and it is true that SNO suggested that you could, this is starting at line 29, this is what you could use, you can attach sensors to the jaws so that the model can better depict the movement of the jaws, but it never integrates that with the actual planning of the orthodontic treatment. So you can animate the jaws moving up and down the way the patient's jaws move up and down, but what you never get out of this patent is animating the movement of the teeth in any non-generic way, anything other than all roads lead to Rome. So that's our response on column four. But is there a dispute over whether there are going to be some instances for some patients where you can, by using a linear interpolation, help a patient achieve straight teeth? I don't think there's any doubt that sometimes, for a particular tooth, the distance between two points is going to be a straight line. But the point is that when you are providing a plurality of orthodontic appliances at the outset of treatment, so you're providing all of the data sets and all of the appliances before you begin treatment, I don't think that there is any evidence in the record suggesting that you could do straight linear interpolation even to the final treatment goal. And, of course, it is not the final treatment goal that's in Snow. It's the generic smile that's the same for all adult patients. And that takes us to what final arrangement for an individual patient means. Yes. If arrangement just means orientation of the individual teeth of the patients, why wouldn't that default model with straight teeth be an acceptable and appropriate final arrangement, final orientation for any patient? I mean, if you were jotting down just a series of angles and rotations on a card conceivably, but what you're doing is actually modeling the mouth. And part of the mouth, as Dr. Martz agreed at page 6913, when you're modeling the mouth, one of the factors that you must take into consideration is the size of the patient's teeth. And in addition to that, there is variation in the shape of the patient's teeth that might or might not be reflected in the final treatment, but is absolutely going to be reflected in how you get there because the size and shape of the patient's teeth affect when the teeth are going to collide. And the collision of teeth is the primary consideration that causes you to deviate from linear interpolation and steer some teeth in some directions and some in others so that the teeth don't collide, whereas snow simply assumes that away. And in the snow animation, you would witness the teeth sort of, you know, transparently pass through each other. How do we know that? I think if you read snow, you know, you see that it is an animation that refers to where you start and where you end. It doesn't take any account of where the teeth are in the intermediate positions, except to divide by whatever number of interpolation steps you put in. So if the top teeth and the bottom teeth overlap, you know, to some degree, and you're going from an underbite, you know, to an overbite, then necessarily the teeth have to pass through each other in this interpolation. Of course, that's not how actual dental treatment would work. That, I think, is why we think it's not reflective of the claimed limitation. I thank the court very much. Thank you very much. Mr. McCain, would you mind starting with this case of controversy question to the extent you can? Sure. Good morning. May it please the court. Scott McEwen on behalf of Appellium, joined today by Catherine Thornton. As to jurisdiction, I would submit that ClearCorrect is here today under what I would generally call the piggyback standing under EFF, Electronic Frontier Foundation, and that presumably ClearCorrect is making a case for jurisdiction here today. If they have it, then we should have it as well, is my understanding of some of the decisions in the earlier case. Case law in point. I can't really speak to their position. Do you have anything that you can say on this question whether, I don't know, put it this way, ClearCorrect feels threatened by a line about being sued under this patent, this now expired patent for its past activities? Sure. I guess the only thing I could say on the record is that there has been an ongoing dispute between the companies involving the vast majority of the portfolio. This patent, the 037 patent, has been recently asserted against others. It's directly related. It's a child patent of the 325 patent, which has been asserted and is being asserted. I guess that's probably the most I can say about that issue. This patent has, there's ongoing litigation with respect to this patent. And other companies in the space. I thought there was one that was, I guess I'm remembering, one was brought but dismissed without prejudice. I'm not remembering it. You may be correct. My recollection is that the 037 patent was at least asserted against Smile Direct. I think that was the one that was dismissed without prejudice. If that was dismissed, okay. But it has been asserted recently within the last year and a half. And it was dismissed because of what the board has done here? I'm not aware of why it was dismissed. We're not a party to that litigation. But getting back to the merits, the 037 claims are not directed to aligners. They're certainly not directed to Invisalign brand aligners. So a lot of what you see in the briefing is the argument that it doesn't fit. And based upon clear, correct witness testimony. But that's all specific to Invisalign aligners. These claims are directed to manufacturing dental appliances. And they specifically describe those appliances as encompassing positioners, retainers, basically everything that was available when this patent was filed. How do we know all of their arguments are directed specifically and solely to Invisalign aligners? I mean, I thought I saw something somewhere, perhaps in their patent owner response, that there would be no motivation to use Snow's digital data sets to make any appliance. Correct. But that's a little bit of a mischaracterization of what the motivation is. So the motivation, there's essentially two motivations to combine for the ground. One of which is, well, if Kessling is making manual appliances, it's obvious to automate that and computerize it. So that's number one. And that's not really addressed in the briefing. What they focus on is number two, which was the argument of, well, you could make Kessling's appliances with more precision. Meaning, if you take a manual process and you computerize it, those formerly manually made devices will be more precise by virtue of the computerized data. Is that the rationale the board actually adopted? Because my understanding is it wasn't this kind of more broader look at trying to merely computerize what was being done manually in Kessling. It was more trying to understand and apply Snow's particular disclosed practice to make appliances per Kessling. And so if we're on that playing field, then we have to study the issue a little more closely than this broader 30,000 foot high kind of inquiry. Sure. I guess I would respectfully disagree that I believe that was what was presented in the petition as to precision between manually made appliances as to computer. But even if we were to go down this road on precision, it all comes back to this ultimate argument about, well, you can't make aligners, right, because you need the specific tooth shape. I mean, that's where when you look at what they're saying about precision, it all comes back to, well, you don't have the tooth shape. And therefore, when you use Snow, it wouldn't work for aligners. But what we've said in the briefing, and this gets to that point on the 139 patent, and the 139 patent is incorporated, I should say, is referenced right in the background section. That's a position. And the citations that are in the briefing and that my friend just pointed out are directed to the splint. So the splint adheres to your teeth. It's sort of in complementary relation to the roof of your mouth. And it pushes what the 139 patent describes as a mouth guard. So the mouth guard is the positioner. And so that mouth guard is not adapted to any specific shapes. In fact, the reason you need the splint is to keep it in your mouth. So if it was precision gripping on your teeth, you wouldn't need the splint in the first place. So the citations to that patent, again, they're trying to distinguish over what the board was pointing to and what they adopted from our briefing is, well, this is a positioner. It's just like a mouth guard. You put it in there, and you rely on the splint pushing up against it to deform the plastic, and then the forces on the teeth are from the deformation. So it's the splint that's providing the force as compared to an aligner that you snap into your teeth and is gripping those teeth and moving it in a particular direction. So in that respect, you can make that positioner with the methodology described in the 037 patent because the 037 patent describes that it covers positioners and retainers and a host of other devices. So when the board rests its decision on the fact that, well, your claims aren't directed to aligners, they're directed to a broad swath of devices, and you don't have to use 3D data at all because you also reference a laundry list of different technologies, and then you come into the board and say, well, no, of that list of appliances, we want appliance C. We want our claims limited to that, and then we want 3D shape technology, which is option four, what have you. So they're arguing for limitations when their claims are directed to a broad methodology of manufacture. And so that's where the board came out on this, is that your claims just don't get you where you want to go. Whether it's Philips or BRI, it's plain meaning what you claimed is providing digital data sets. The only thing modifying data sets is digital. Every one of those examples in the specification, whether it's 2D x-rays, 3D x-rays, MRI, that's all digital data, and that's what was claimed. What should we do about the limitation about the final arrangement of the patient's teeth? So with respect to the argument about the final arrangement. To be more specific, sorry, the question didn't come out well. Snow's idealized final position is this generic default mouth with straight teeth, and so it's not really attributed to any given patient, and it's not going to be in any way a representation of any given patient, and it's not going to have the same tooth size scaling that all the prior digital data sets would have, nor would it have the jaw size scaling either. So how can that default for a male or female final idealized arrangement be regarded as a final arrangement for an individual patient? Well, I would submit it does have the scaling because Snow teaches that the way that you create the individualized model, and it is an individualized model. It's not generic. You're taking an x-ray. No, no, but it just says keep straight about the starting point and the final point. Their entire argument is about the final point, which is completely generic. Everybody agrees that Snow starts with the generic, says overlay a picture of an individual mouth, adjust the generic, and now you have, as opposed to generic or standard, you have individualized, but it's the defective mouth. Their focus is on the end of the orthodontic process, which is not individualized. I think, Your Honor, this gets back to your point about the citations to Dr. Ma's declaration of paragraph 93. In addition to being referenced in the footnote, page 31 of the final written decision expressly adopts various pages of the petition, including the underlying citation to evidence as its own. Those paragraphs are specifically adopted. What the board did in this instance is they looked at the testimony of not one but two witnesses. We have two orthodontists saying, and this is entirely consistent with the 037 patent itself, well, the final position, that will be up to the orthodontist. Otherwise, you wouldn't need them. Everybody, this is a cosmetic procedure. Everybody wants the ideal smile. Everybody wants the ideal nose. Not everybody can get that. So when you have the ideal final position and you have a starting point, you may stop someplace along that line because you just can't get there for everybody. Now, you'll get there for some people, but you won't get there for everybody. And that's what the witnesses said, and the board— I guess it seemed to me, I was having a hard time finding that Martz said that in paragraph 42, so let me put that aside. Assume that Ma says that in paragraph 93. I think Mr. Jay's position is that's just clearly incorrect under Snow itself because that paragraph 93 refers to the language early in Snow, column one maybe or something about second position. And I think Mr. Jay's position is that Snow is clearly there referring to the end of this whole process, not on the next column where there's a description of a series of intermediate positions through interpolation. I think the board explicitly adopted the discussion in column three relative to moving from the first point to the standard— moving from the individual scan to what they call the standard model. And that's what they described as the treatment path and showing that on the screen. And so I think what the board did is viewing the record, reading the statements from Dr. Ma, and reading the 037 patent itself, which talks about it is known in the art that an orthodontist provides a prescription. So it's not just you sit in the chair and you can come up with this unique stop point. The 037 patent doesn't describe that anywhere. They're also trying to get to an ideal smile. That's the whole point. It's a cosmetic procedure. So to narrowly view Snow to say, well, it just has this road to Rome, I don't think that is consistent with the evidence of record or the way that the board weighing this evidence understood these technologies and methodologies to work. There's always the ideal end point where you stop along the way as the witnesses have testified and as the board has accepted as substantial evidence is up to the orthodontist. That's why you have the orthodontist. That's the value that they're bringing. Otherwise, everyone would just go and rely on these computers to do everything for them. These claims are directed to an arrangement of teeth, and that's all that's required. Again, you're scaling with Snow. You're moving individual teeth. All of that is exactly as described in the 037 patent. The 037 patent is incorporating by reference various aspects of the 3D scanning. They didn't invent 3D scanning. Just so I understand, because I'm getting confused now, Snow's final arrangement, is it scaled or is it not scaled? I believe it's scaled as to shape because when you create that first model, you get the x-ray. Wait a second. You're saying Snow's final arrangement is scaled as to shape of teeth? That's what I just heard you say. Yes, because when you start... But I thought Snow was just about, if it's scaled anything, it's the size of the teeth, not the shape of the teeth. You're overlaying the x-ray onto the shape of the teeth, and you're manipulating that x-ray to essentially line up. Where does Snow say it's doing any scaling of the shape of the teeth? My total understanding of the board's decision was Snow doesn't do that, but it doesn't matter. That's correct. I'm confused why you're saying... I may have misspoke about scaling. The scaling I'm talking about is basically overlaying the x-ray onto the shapes. Once you make that overlay and you adjust every individual tooth, as you move to the final position, that scaling and those shapes remain the same. What about in the final arrangement, though? As I understand Snow, Snow is just... The final arrangement is this standard model, which goes back to whatever the default size is. That's correct. The final arrangement would have the same tooth shape as the beginning arrangement. When you say beginning arrangement, I don't know what you mean by that. The beginning shape. The shape is remaining constant. The shape is remaining constant. What about the size? The size sort of just slings back to the standard model, right? Right, but there's that step in the beginning. Okay, so then if there are like six data sets, the initial data set for an individual patient will have some scaling of the teeth size. Correct. So will the second one, the third one, the fourth one, the fifth one. And then the sixth one, we revert back to the standard model teeth size, right? We would... Is that your understanding of Snow? My understanding is we're not reverting back. We're maintaining the original mapping and moving to an idealized position using those... The position, yes, but I'm talking about teeth size now. If we're talking about size and shape, are we saying they're... I'm just talking about size. Okay. Shape is the same all the way through because Snow doesn't talk about doing anything on an individualized level for a given patient with regard to teeth shape. I agree with that. It does talk about scaling on teeth size. Right. So final arrangement for a given patient, what is that going to look like under Snow's teaching? My understanding is it reverts back to the standard model for whatever the standard default sizing of a male patient's teeth are or a female patient's teeth are. So what you look at when you look at, as I said in my hypothetical, six digital data sets in an iterative way, you're going to see the first five of them mapping up approximately at least to the patient's particular teeth size. But then the last one, the sixth one, the final one, what we will be looking at in that digital data set is the standard default teeth size. Am I right about that? That's not my understanding. Okay. Where in Snow would it say something different and what is it different from what I just said? My understanding is that scaling that is done, so that is related to size, that's carried through throughout the process. The shapes are generic and they stay generic. That's my understanding and I believe that was the board's understanding. Again, this also gets back to... Where did the board say that the final tooth arrangement from Snow, that what Snow teaches when it talks about reaching that idealized arrangement, the teeth size are going to be the exact same for all the digital data sets going through. I thought... My understanding was there's just this default and that's going to be your final digital data set that comes out of Snow. My understanding is the default is a default for tooth shape and perhaps the ideal arch. The size, I guess, is where I don't believe the board spoke to that issue. As I read Snow, basically, the vampire ends up not a vampire. Well, yes. We would hope that that's the goal. But again, all of this assumes that you're trying to make aligners and that you need an appliance that fits. Can I take you back to paragraph 93 on A1828? I guess the more I read it, the less persuaded I am that it even says a treatment plan may stop at an intermediate place. Without that, I don't see how there's evidence saying that Snow shows a non-generic stopping point. Well, what the board did in this instance was to credit that testimony and find that, again, is to credit Dr. Ma's testimony. Let me try to be more precise. I think my initial question to you before presupposed that Ma said what the board is attributing to him. Now I'm saying, I'm not sure Ma says that. Okay. Can you look at page 1828 and tell me what in that paragraph says that treatment may stop at some less than final step in the Snow contemplation? As opposed to saying you might do the sequence of images anywhere along the way, which I think is all that that crucial sentence, the then sentence. Right. That's the sentence I'm looking at. But I think all that says is after determining the idealized second position, which could correspond to any point in time during the treatment, such as an intermediate or final tooth arrangement, a sequence of images representing can be taken. But where does that suggest that the final endpoint of the process, which is what the claim contemplates, can be something other than what Snow is contemplating as the final, which is standard and not individualized? Sure. I guess I would point to that parenthetical such as an intermediate or final tooth arrangement. So we're saying there we're not necessarily always going to the end. We may stop at some point because based upon the physiology of a given patient that you've gone as far as you can go, at least for an aligner. I'm just not sure that that says that. I think all this is saying is that at intermediate stages of a process, what makes them intermediate is that the actual process is continuing. Each one of those could be an idealized second position within Snow, and then you can do a sequence of images to that. But that's not saying that for an individualized patient, the endpoint is an intermediate point. You wouldn't call it an intermediate point. But I think this is in the context of Snow, so an intermediate point by definition would not be going all the way to the end, which is what this sentence is discussing. So what Dr. Ma is saying here is this is where the doctors come in. This is where the prescription comes in. This is where when the 037 patent talks about prescriptions, the doctor has to look at what's going on and pick the point that makes the most sense for the patient. And that's what this paragraph is being directed to. And this is what the board credited not only for Dr. Ma, but also for the second witness, Dr. Martz. So there's substantial evidence there as to finding an endpoint. And again, this all sort of supposes we're talking about aligners here, and not devices that don't require this kind of resolution, which the claims simply aren't directed to. Let me just ask you about that. Why does this particular argument suppose that we're talking about aligners? And by aligners, I think what you mean is close-fitting to match the contour of individual teeth. So what I mean by aligners is the shape argument. I guess I didn't understand that this particular argument depended on the view that the devices at issue needed to match the shape of the individual teeth. Well, the reason that this depends on that is because they point to testimony of Dr. Martz talking about will this endpoint fit a given patient. So it always goes back to this argument about what Dr. Martz said. To use what Judge Chen was talking with you about, just the size, the height of the canines. Let's assume all canines have exactly the same shape. They're all very, very pointy. But the height can vary a lot, and snow seems to make all the canines at the end be just the same for all males and the same for all females. Right. Well, and the reason, as Snow describes, because for a large segment of the population, that ideal model will work. It won't work for everyone. We don't dispute that. But the reason that it's the model that's used is because it works for most people. So I think even accepting all of that, I don't know that it tilts the scales in favor of the appellant here. And then finally, I would just add that, as pointed out in the institution decision, what the board made clear is, even accepting all of this, it would still, if you wanted more resolution, if you knew that you were making a device that required these shapes, you would just take the off-the-shelf scanning technology that's out there. Because that's the prevalent teaching in the art that was stated in the institution decision. It was argued in the petitioner's reply. The board didn't adopt it, though, in the final written decision, right? Well, what the board did say is that they agreed... The board said, we're not going to address this particular form of... But prior to that, Your Honor, the board said, we agree that that's exactly what you would do because that's exactly what the 037 patent does. They've taken an off-the-shelf 3D scanning technology and they've used it to make aligners. I don't quite understand. Are you saying that's reviewable for us? Are you saying that was a finding by the board that we can review? I'm saying they did find that, at least with respect to using an off-the-shelf technology with snow, that that was just as obvious as explained in the 037 patent. They didn't go into explaining the remainder of that ground because they rested on the other. But they at least said, we agree with that, and that's something that they brought up in their institution decision, and then they raised again a final written decision. So I think I've gone over my time, but we would submit that the board's decision rests on substantial evidence, and we would pass her inference. Thank you. Thank you, Your Honor. I won't take up too much more time. I just want to address a few points. First, on this question of Dr. Ma, a couple of things. One, just to begin by noting that at the beginning of footnote 10, the board credits Dr. Martz but does not say anything about Dr. Ma. Well, it doesn't say directly, but it does cite, relies on petition page 17, which relies on both of them, and I think as Mr. McKeon pointed out earlier in the decision, the board specifically says it adopts petition page 17 and the underlying references. Sure, but at the beginning of the footnote, I think it says what it's taking from that page, which is Dr. Martz, but that's right at the beginning of the sentence in footnote 10. But even if that's not right, so as the questioning with Judge Taranto and my friend brought out, Dr. Ma never says that one of these interpolation steps would be a treatment goal. So even if you agree with everything that he says, then that doesn't get the petitioner where it needs to go. But in addition, he says something that is quite wrong, which is that the idealized second position could be anywhere along the chain, and that is just not right. If you look at Snow, you will see that in column four, lines 19 and 26, you can see that the animation in Snow is to the 3D standard model. That is what the idealized second position is. It's always the same. It's the 3D standard model. Speaking of Snow and the final position, I think, Judge Chen, it's worse than your colloquy with my friend brought out, because the fangs, if someone has big teeth, I think that the way the animation works is that they shrink with each step progressively. So it's not just that the final depiction isn't correct. But that, when we talked before, I couldn't know where in Snow you were pointing to for this shrinking idea. Sure. Well, you don't have to take my word for it. I mean, Dr. Valli says it. Right, but he has to have something to base that on. And so that's what I'm trying to figure out. Snow doesn't speak in these terms. So it seems like it's a speculative thing at best, in terms of reading Snow as to say the teeth are successively shrinking or successively expanding to reach the 3D model. I guess I would just note that there's no evidence to the contrary, and no one in the record submitted any contrary reading of Snow. And even if you don't agree with me about the interpolation steps, so that there's progressive shrinking, then the alternative is what your question to my friend brought out, that maybe you have a giant jump or a giant shrinkage to the standard teeth at the end. Because it is quite clear that the teeth at the end are the teeth of the 3D standard model. Now, you never have shape, because you're using generic teeth from beginning to end. So you never have the actual shape. But you start with a rough approximation of the patient's size. And our view is, and Dr. Valley's view was, that it gets rougher and rougher and rougher, less and less accurate with each step, until at the end you wind up not with the patient's size, but with the size of the generic standard model. Third point, I just wanted to bring out about the 139 patent. My friend suggested that that is a positioner. It's a compound device. So there's a positioner portion and a splint portion, all the same device. What the splint does, the splint anchors the positioner. And what 139 patent says, page 4388 of the appendix, column 2, line 42, that both the anchoring part of the splint and the moving part of the positioner are closely fitted. And this is not something that's rubberized and off the shelf and able to be used generically for everybody in the tooth population. Finally, I think I would just note that the reference to off-the-shelf scanning technology. Sure, there was technology to scan the patient's mouth as it existed, but the whole point of the invention is that the interpolation steps and the final tooth position are all made electronically or digitally before you start treatment. And there's no suggestion that that was taught in the art, that you can't just take off-the-shelf technology and produce digital images of the interpolation steps. Right, but I guess the argument that was made that wasn't actually addressed by the board, as I understand it, is you can use the 3D technology to create a digital data set based on the patient's actual teeth in every which way, shape, and form. And then based on snow, it would be very obvious to make your digital data set based on that all the way to the final end without doing something that just sounds crazy, which is to create a final appliance that would be based on some default mouth rather than what you've been working with for all the previous digital data sets and appliances. That's the argument, but that requires a large gap between the teachings of the written, printed publications, patents and printed publications in the record, and what you would need to practice the patent. Because the technology, and this is brought out in Dr. Martz's deposition, the technology to selectively move around individual teeth, not just from Snow's scan of a patient's mouth and not from generic teeth, I'm sorry, not just from generic teeth, but from an actual scan of a patient's mouth, that technology was not in common use as of the priority date. And Dr. Martz admitted that in his deposition that Hultgren, who is the author of one of the prior art references, had a team of PhDs working on exactly that problem at or around the priority date. There's certainly nothing in the record that would fill that gap, and in an IPR where the board is limited to the obviousness combination that has come up with it. The claims, though, don't speak in terms of how one would go about doing all of those interpolations, right? It just says in kind of a result-oriented way, you're getting from A to B using a bunch of different data sets. Well, there are discussion of how to get there in the specification involving particular techniques that can be applied, but in any event, what is clear from the claims themselves is that you need not just the original, like an image of the original mouth, you need also an image of the final mouth, and you need images of each step in between, and you need them before the treatment begins, so that you can fabricate all the appliances at that time. Unless the court has further questions, I thank you for your time. Thank you. We thank both sides in the case that submitted.